IN THE MATTER OF LOUIS GOLDSTEIN, ESQUIRE.

*(December 20, 1951.)*

SOUTHERLAND, Chief Justice, WOLCOTT and TUNNELL, Justices, sitting.

*Henry M. Canby* and *James L. Latchum,* petitioners, constituting a committee of the bar appointed by the Court.

*Daniel O. Hastings* for respondent, Louis Goldstein.

Supreme Court.

SOUTHERLAND, C. J.:

Pursuant to charges of unprofessional conduct against Louis Goldstein, Esquire, a member of the bar, the Censor Committee of this Court held hearings upon the matter and filed its report with the Court. The report finds that certain of the canons of professional ethics have been violated by the respondent, viz., canon 6, relating to an attorney's representation of an interest adverse to that of his client; canon 9, relating to direct communications by an attorney to one represented by another attorney; and canon 38, relating to the acceptance of compensation or commissions from others without the knowledge and consent of his client. The Committee accordingly found the respondent guilty of unprofessional conduct.

By direction of the Court a committee of the bar has filed a petition presenting these charges against the respondent. To the bar committee's petition the respondent has filed an answer in the nature of a motion to dismiss. The bar committee and respondent's counsel have entered into a stipulation accepting as correct certain findings of fact embodied in the report of the Censor Committee and submitting to the Court the record of the testimony and exhibits received at the Censor Committee's hearing of the matter. Under the terms of the stipulation the Court is free to examine the record and make its own findings and reach its own conclusions.

The state of the pleadings, above outlined, leaves for our determination only the following question:

Do the admitted facts justify the conclusion of the Censor Committee, and the charges of the bar committee, that the respondent has been guilty of unprofessional conduct?

The essential facts are these:

In September of 1950 Mr. and Mrs. Vincent J. Rago of Wilmington, Delaware, became interested in the purchase of real estate. They were offered a property by Mr. Morris Frankel on West Ninth Street for $12,000, $700 to be paid down in cash and the second mortgage to be taken by Mr. Frankel, representing the difference between the amount of an obtainable first mortgage and the balance remaining due. The Ragos retained the respondent Goldstein to represent them.

During the discussion about the possible purchase of the Ninth Street property Goldstein asked Mrs. Rago whether she would be interested in buying a house from him for $12,000 on the same basis as the Frankel proposal if a more desirable house could be found. Mrs. Rago assented. Goldstein examined some newspaper advertisements and found that a house, 910 West 10th Street, was for sale. Telephoning the agent he found the price to be $10,500 and so advised Mrs. Rago. Mrs. Rago inspected the property and liked it. Mr. and Mrs. Hodgson, the

owners, informed her that the price included a refrigerator and stove. Subsequently Mrs. Rago telephoned Goldstein her approval of the Tenth Street house. Goldstein thereupon negotiated for the purchase, leaving the impression with Mr. O'Keefe, the Hodgsons' agent, that he was acting for a client. Goldstein finally made an offer of $10,300 for the property and it was accepted, and on October 3, 1950, a contract of sale was signed between the Hodgsons and Marie M. Doordan, Goldstein's secretary and nominee. The contract price of $10,300 was payable $500 down and the balance in cash at the time of settlement. In addition to the real estate the refrigerator and stove were included.

On the day of this contract, October 3 (possibly a day or two later), Mrs. Rago came to Goldstein's office by appointment and he showed her and asked her to read a form of contract providing for the purchase of the house by installment payments, without any provisions for any permanent financing through mortgages, similar in form to the definitive contract hereafter described. After some conversation about the contract, Mrs. Rago departed leaving with Goldstein a postdated check for $600, with the understanding that she would return on October 6 to sign the definitive contract.

Apparently Mrs. Rago—and without doubt her husband—had some misgivings about the failure of the contract to provide for mortgage financing, and a day or so later (probably October 6) she sent for and obtained from Goldstein's office a copy of the definitive contract she was to be asked to sign and showed it to her employer and to Mrs. Josiah Marvel, Jr., one of her customers. She was advised not to sign it. The contract set the purchase price at $12,200; provided for a down payment of $600 and monthly payments of $100 until the total purchase price should be paid; required the payment of interest on the unpaid balance at the rate of 6 per cent; and provided for the passing of legal title upon completion of all the payments. Mrs. Rago told Goldstein that she had been advised not to sign the

contract; whereupon he told her that she should consult an attorney but not laymen with respect to it. Either at the same time or a day or so later she told him that she had stopped payment on the $600 check which she had left with him. Goldstein told her that so far as he was concerned "the transaction was off and [they] would have no further dealings." Mrs. Rago, explaining that what she had done was on the advice of her friends, asked him to change his mind and inquired whether he would be willing to sell the property for less money if she obtained her own financing. Goldstein said he would do so at a fair profit and that the price would be $10,650. This was satisfactory to Mrs. Rago.

On October 9 an agreement between Goldstein's nominee and Mrs. Rago was executed, providing for the sale of the property to Mrs. Rago for $10,650, payable $600 down and the balance in cash at the time of settlement. The contract was on a printed form of agreement for the sale of real estate providing (as a part of the printed form) that the seller agreed to sell and the purchaser agreed to buy the "land with buildings thereon erected, briefly described as follows:". In the blanks after the quoted phrase was inserted in pencil the following: "The contract of sale from present owners of 910 West 10th St.— Wilmington, Delaware". On the same day Goldstein applied to the Wilmington Trust Company on behalf of Mrs. Rago for a first mortgage loan of $7,000 at 4½ per cent. Mrs. Josiah Marvel had agreed to take a second mortgage for the additional cash required for the purchase. On October 31 Goldstein settled with the owners of the property who gave a deed to Marie M. Doordan, his nominee, and on the following day he settled with the Ragos.

At the time Mrs. Rago signed the contract of October 9 for the purchase of the Tenth Street property she understood that Goldstein was making a profit of $150 over and above the selling price of the house. She did not know that he had actually bought the house for $10,300. Between October 9 and the day

of settlement she visited the Hodgsons' home and learned that fact for the first time. Mrs. Hodgson said to her: "They kept after us, your lawyer did, and said that his client wanted $10,300." Mrs. Rago later called Goldstein on the telephone about the discrepancy but he refused to talk to her about it.

Samuel R. Russell, Esquire, an associate of Josiah Marvel, Jr., in the practice of law, represented Mrs. Marvel in connection with the second mortgage loan. He discussed the matter with the Ragos prior to the final settlement and advised Mrs. Rago that he and Mr. Marvel were of the opinion that her October 9 contract could be voided because of the attorney-client relationship between the parties. Nevertheless the Ragos determined to complete the transaction.

In connection with the settlement Goldstein charged Mrs. Rago a search fee based on the full purchase price of the property and a fee for the preparation of the deeds and the bonds and mortgages. There is no satisfactory evidence, however that he ever delivered to his client a title certificate, in the absence of which the fee should not have been based on the full purchase price.

When Mrs. Rago took possession of the property they found that the range and the refrigerator which they thought they had bought had been removed from the property. They failed to get any satisfaction from Goldstein with respect to the non-delivery of these articles.

At no time did Goldstein tell Mrs. Rago that he no longer represented her as her attorney, and at no time did he take any active steps to see that she was adequately represented by other counsel in connection with her business dealings with him.

██ That the foregoing facts establish a case of professional misconduct we entertain no doubt whatever. Quite apart from any offense against the canons of ethics, the respondent was guilty of a breach of trust against his own client. Knowing it to be his client's wish to buy the Tenth Street house and

knowing that the price was $10,500, he proceeded to attempt to acquire it for himself for a price $200 less and then resell it to her at a profit of $350—part of the profit being undisclosed. It is admitted that when he secured the contract of October 3 from the Hodgsons he was Mrs. Rago's attorney. That he could in law acquire no interest in the property adverse to hers is elementary; whatever interest he acquired he held for her benefit as a constructive trustee. That he used his own money to make the down payment is immaterial to the point; a lawyer is not permitted to traffic in his client's affairs for his own profit in disregard of the undivided loyalty commanded by his professional duties. The making of a secret profit was, in law, a fraud. *Robertson v. Hirsh*, 276 *Mass.* 452, 177 *N. E.* 676.

The suggestion made by respondent (to some extent tacitly acquiesced in by the Censor Committee) that on or about October 6 the attorney-client relationship was terminated is not acceptable. Even if it were sound it would in no way relieve the respondent from the charge of making a secret profit at his client's expense; but we do not think it sound. The only evidence supporting it is the respondent's suggestion to Mrs. Rago, made in response to a complaint about the terms of the draft of installment contract, that she have the contract examined by another attorney. It was in substance nothing more than a suggestion that she take a second opinion; it was in no sense a plain, unequivocal and understandable notice to his client that he was ceasing to represent her; much less did it definitely advise her that since he was dealing with her as a seller he was disqualified from acting for her and that she should obtain immediately other and independent advice about the entire matter—not merely about the form of the contract. *Cf. MacNaughton v. Stone* (1950), 1 *Dom. L. R.* 330 (*OHC* 1949).

Moreover the respondent admittedly charged Mrs. Rago for an owner's title examination of the property. It would be an extraordinary situation if, without any definite communication or understanding with respect to the continuance of employ-

ment, a lawyer may shuffle it off during the period when its responsibilities are onerous and reassume it when it again becomes profitable.

We are of the opinion that the conduct of respondent during the whole matter must be tested by the rules applicable to the conduct of an attorney. These standards are implicit in the oath that every laywer takes upon admission to the bar, which requires of him fidelity and unswerving loyalty to his client.

Viewing the matter in this light, we can see no escape from the conclusion that from the beginning to the end of the transaction respondent had uppermost in mind the protection of his own interest. He suggested that Mrs. Rago might buy a property from him; but he had no property for sale and had to find one which he could buy for the purpose of resale. The suggestion is strong that the idea of profiting at her expense was in his mind from the first. It is re-enforced by the provisions of the draft installment contract which was never signed. Why should his client be required to pay 6 per cent interest on $12,200? A first mortgage loan at $4\frac{1}{2}$ per cent was readily obtained from a banking institution.

Finally, what possible excuse is there for his failure to deliver, under the contract with Mrs. Rago, the personal property covered by the Hodgsons' contract? Respondent's counsel concedes, with commendable candor, that Mrs. Rago was entitled to whatever personal property Goldstein was entitled to under the Hodgsons' contract. We agree with this, not only because the Rago-Doordan contract appears to contemplate it, but also because, as heretofore pointed out, whatever Goldstein got under the Hodgsons' contract belonged, at his client's option, to her. The record is bare of any suggestion justifying the retention of the personal property.

We find the respondent guilty of unprofessional conduct. His fundamental error was to allow perception of his fiduciary duty to be clouded by self-interest in his own business

transactions. The commingling of the roles of vendor and attorney may not always be wrong; but it is highly undesirable and so far as possible it should be avoided. The opportunities for over-reaching are so great that the law, in reviewing such a transaction as here presented, does not pause to inquire whether the lawyer has unduly influenced the client, but only whether the lawyer has lived up to the required standard of undivided loyalty. *Moody v. Cox and Hatt*, (1917) 2 *Ch.* 71. A lawyer is a trustee for his client and a "trustee is held to something stricter than the morals of the market place". *Meinhard v. Salmon*, 249 *N. Y.* 458, 164 *N. E.* 545, 546, 62 *A. L. R.* 1.

In the consideration of the matter of disciplinary action, we are inclined to concur in the committee's suggestion that the conduct of the respondent is traceable to a large ignorance of professional duty rather than to a purposeful intent to defraud. Action will be taken at a forthcoming session of the Court. That it is respondent's duty to make full restitution to his former client is beyond question. Such restitution should include the personal property not delivered, or its fair value, as well as the profit of $350 improperly obtained. If, prior to the session of the Court, respondent elects voluntarily to make full restitution, that fact, if satisfactorily established will be given appropriate weight.