MILTON R. OPDYKE, Plaintiff below,
Appellant,

*vs.*

KENT LIQUOR MART, INC., HERMAN C. BROWN, GLENN A. RICHTER
and GEORGE M. SMITH, Defendants Below,
Appellees.

*Supreme Court, On Appeal, May 25, 1962.*

E. N. *Carpenter, II,* of Richards, Layton & Finger, Wilmington, for appellant Milton R. Opdyke.

*Vincent A. Theisen,* of Theisen & Lank, Wilmington, for appellees.

SOUTHERLAND, Chief Justice, and WOLCOTT, Justice, and CAREY, Judge, Sitting.

SOUTHERLAND, Chief Justice: The principal issue in this case concerns the ownership of certain shares of stock of the defendant, Kent Liquor Mart, Inc.

In the summer of 1959 Milton R. Opdyke, the plaintiff, and George M. Smith, one of the defendants, discussed a possible venture into the liquor business. They learned of a vacant store in a shopping center near Dover. They interviewed Glenn A. Richter, one of the defendants. Richter was one of two members of Richter and Meyer, which owned the shopping center. He told them that the store would be available if he were made a co-owner of the business. They agreed.

Opdyke and Smith retained Herman C. Brown, Esq., an attorney practicing in Dover, to incorporate the business  The corporation was formed in September, 1959. The issued capital stock was 300 shares, of which each of the three men received 100. At the first incorporators and directors meetings all three men and Brown were present. There was some discussion of the desirability of restrictions on the sale of his stock by any stockholder. Brown explained to them the legal procedure required. Nothing ever came of this.

Application was made to the Alcoholic Beverage Control Commission for a liquor license. It was granted in June, 1960. The corporation borrowed $20,000 from the Bank of Delaware to provide funds for a stock of goods and working capital. All three stockholders and their wives joined in the note. The corporation also incurred a debt of $2600 to Richter & Meyer for the construction work.

The store was opened in August, 1960. It did not prosper as its owners had hoped. At a meeting on October 9 Richter said he would be willing to get out of the business. At another meeting on October 20 Richter renewed his offer to withdraw. The terms of his offer are in dispute, but it is admitted that after discussing the matter Opdyke gave Richter a check for $415, on the face of which Opdyke endorsed: "For equity in the corporation." ($415 was the amount of the contribution of each stockholder.) Richter negotiated the check and retained the proceeds until after the bringing of this lawsuit. After October 20 Richter was not active in the business.

On November 19 Opdyke and Smith met. Smith was dissatisfied and wished to withdraw. They discussed a possible purchase by Opdyke, but the result is in dispute. On the following day Smith sold his shares to Richter for $415 and Richter's agreement to relieve Smith and his wife from the obligation at the Bank of Delaware. A new note was executed, joined in by Richter and Opdyke and their wives, and also by Robert Richter, Richter's nephew, and his wife.

Sometime later Richter transferred the 100 shares he had bought from Smith. He gave 60 to Robert Richter and 40 to Smith. Richter and Smith called on Brown and gave him instructions about the transfer of the shares. They were transferred on February 2, 1961. They also discussed the holding of a stockholders meeting. By that time Brown realized that the three men were not getting along.

Some days later Opdyke telephoned Brown that he (Opdyke) had bought Richter's shares. Brown asked him whether he (Opdyke) was not obligated to relieve Richter of Richter's liability to the bank. Opdyke said that he was not so obligated. Apparently Opdyke also went to see Brown about the matter prior to March 7.

Brown testified that he did not intend to be drawn into "any fight among stockholders as to who owned what"; but as counsel for the corporation he thought he had some duty "to try to straighten it out." As above indicated, he had already gathered that some difficulty between them was building up. Brown accordingly suggested to Opdyke that a meeting be held.

On March 7 the meeting was held in Brown's office. At Brown's suggestion Mr. and Mrs. Opdyke came in first. Opdyke asserted that he had bought Richter's stock and showed Brown his cancelled check for $415 with the endorsement on its face. Brown indicated some doubt.

A half hour later Smith and Richter came in. A matter of renewing the lease on satisfactory terms was discussed and settled.

Brown then brought up the matter of Richter's stock. Because of the forthcoming stockholders' meeting he thought it desirable to attempt to adjust the difficulty. He said that Opdyke had a problem with respect to the ownership of some stock. He explained to them

that he was not representing any of them individually, but was the attorney for the corporation. He suggested that they get their own attorneys. He also said that if they wished to discuss it, he would act as moderator.

He asked Opdyke to state his case. Opdyke did so. Richter replied that the stock had been sold with the understanding that Opdyke would relieve him (Richter) of his obligations; that Opdyke had not done so;-and that Opdyke did not own the stock.

Apparently in an effort to settle the dispute, Opdyke asked Richter to let him have 60 of Richter's shares so that he would have control. Richter refused.

Brown then, also in an attempt to settle the dispute, asked Richter if he would still offer to transfer his original 100 shares to Opdyke if, in addition to the $415, Opdyke would arrange to relieve him of his obligations. Richter replied that he would do so. Brown asked Opdyke if he was satisfied to try this and Opdyke said: "Yes." Brown then asked Richter if Richter would agree to include the other 100 shares in the offer. Richter assented. Smith, the owner of 40 shares, also agreed. Opdyke seemed satisfied.

It was understood that Opdyke would have until March 13 to refinance the loan and the debt to Meyer and Richter. This time limit was extended. On March 24 Opdyke told Brown that he (Opdyke) was going to complete the deal.

On the following Tuesday (March 28), Richter and Smith called to see Brown. Richter said that on that morning Opdyke had told him that the deal was off. Richter and Smith had a problem—a proposed sale of the corporation to a Mr. Behan for $30,000. To this Opdyke would not agree. After discussion Brown advised them to offer Behan two-thirds of the stock for $20,000. As they were leaving Brown said that he was sorry to see this happen, and that he would have some interest, on behalf of a client or of himself, in purchasing all or part of the corporation. They told him they were obligated to pursue the matter with Behan, but if he did not accept their offer they would be interested in talking to Brown about it.

Brown was then not in a position to buy the stock for himself because he already had an interest in another liquor store, and he thought that a regulation or ruling prohibited multiple holding of liquor licenses. However, on the afternoon of the 28th he unexpectedly effected a sale of that interest. He then called Richter at Richter's home, explained that he was now much more interested in the purchase of the stock of the Kent Liquor Mart, and asked whether, if Richter had a higher offer, Richter would be bound to go back to Behan. Richter said he would talk to Smith, but he, himself, would feel under no obligation to Behan if he had a higher offer. Brown then offered $21,000 for the two-thirds of the stock, under the same conditions. Richter said he would consult Smith and advise Brown. Later Richter confirmed the sale. Brown went to Richter's home that evening and gave Richter a deposit of $1,000. Smith was present, and the method of payment of the contract price was agreed upon.

Before leaving Brown requested Richter and Smith not to tell Opdyke of the sale because he (Brown) wanted to tell Opdyke himself.

About nine o'clock the next morning, Brown went to the store and said:

"Mickey, I have some news that is going to be a surprise for you, I am sure. I bought Mr. Richter and Mr. Smith and that group's stock last night, or agreed to buy it. I asked them not to tell you about it because I wanted to tell you about it myself."

Brown explained to Opdyke what the transaction was. He then told Opdyke that there were three ways in which their association could continue: (1) Brown would buy Opdyke's stock; or (2) Opdyke would retain his stock; or (3) they would not agree and "would have some kind of battle."

After more discussion Opdyke agreed (according to Brown) to continue as a "partner." The possibility that Opdyke's stock, because of his minor position, would "become worth $10" was discussed. According to Brown's recollection, Opdyke first suggested it.

Opdyke said he was not angry at Brown, but he was angry at Richter and Smith, because he thought he had bought Richter's stock. Brown testified: "He was angry and disappointed because I had told him that I had purchased Richter's stock." His anger was directed at Richter, and several times he spoke of suing Richter because of this.

The matter of the new loan at the bank was discussed, and Opdyke agreed that he and his wife would sign the note. Later that day Brown arranged for the loan at the Farmers Bank. At six o'clock Opdyke came to Brown's office. Brown and two friends were there. Opdyke said he had nothing against Brown, but he was going to sue Richter. Opdyke again agreed to continue as a "partner."

About a week later the bank was about ready to close the matter. Brown went to the store to see Richter and Smith. In a little while Mr. and Mrs. Opdyke came in. Opdyke had just consulted another attorney. Brown started to explain about the closing, but noticed a stiffness in Opdyke's attitude with respect to consummating the transaction. Opdyke said he would have to call his attorney. He was advised to sign nothing and nothing was signed. The stock and Brown's note were placed in escrow.

The present suit in Chancery was thereafter instituted.

In the court below Opdyke sought various types of relief. Several questions were presented to the Vice Chancellor for decision. He decided them all in favor of the defendants and dismissed the bill.

Opdyke appeals. In this court he raises three of the questions raised below.

I. Opdyke insists that the transaction at the October meeting resulted in his purchase of Richter's 100 shares of stock, without conditions. He stresses the endorsement on the check, and Richter's acceptance and retention of the money. Richter contends that he attached to his offer the condition that Opdyke should relieve him (Richter) of his "obligations" i.e., his liability on the bank debt and the liability of the Kent Liquor Mart to Richter and Meyer. Smith corroborated Richter.

■ A conflict of oral testimony was thus presented to the Vice Chancellor. He resolved it in favor of Richter. That finding will not be disturbed here, for there is competent testimony to sustain it. *Blish v. Thompson Automatic Arms Corp.*, 30 *Del.Ch.* 538, 64 *A.2d* 581, 604. Opdyke assails Smith's testimony as wholly unworthy of belief. It is certainly unsatisfactory, but even if it be rejected there is clearly sufficient testimony to support the Vice Chancellor's finding.

On this point we affirm the holding of the Vice Chancellor.

II. Opdyke next claims that he is entitled to a money judgment, representing extra compensation for working in the store. He was paid $50 a week. He testified that he asked for $75, but agreed to take $50 and to collect the additional weekly payment of $25 when the corporation should be able to pay it. He says Smith and Richter agreed to this. They deny it.

The Vice Chancellor did not resolve this conflict. He held that even if Opdyke's version of the arrangement were accepted, yet the corporation was not able to pay the claim. This holding is challenged. Opdyke says that the written evidence in the record of the corporation's financial condition refutes it.

■ We do not reach this question. We are satisfied that the point was never properly presented to the Vice Chancellor. Indeed counsel candidly admitted that the matter of the corporation's financial condition was not pressed below.

We decline to pass upon this question.

III. Opdyke's third point raises a very serious question. He asserts that Brown, as a lawyer, owed him a fiduciary duty; and that when Brown acquired Richter's stock he violated that duty. He contends that Brown by the purchase acquired an interest adverse to his client, and also that Brown, even if his fiduciary relation had theretofore terminated, made use of information acquired in a confidential relationship in a way adverse to the interest of his former client.

Brown replies that his fiduciary duty was to the corporation only, and not to any of its stockholders. When the dispute between them

arose he advised them that he was not representing any of them but only the corporation. Consequently, he argues, he was free to buy stock in the corporation from any stockholder.

The Vice Chancellor sustained this defense. He took the view that Brown's original employment was limited to the incorporation of the business and the obtaining of the liquor license; that the issuance, holding or transfer of shares was not within the terms of his employment; and that subsequent to incorporation he was attorney for the corporation and not for the stockholders. The Vice Chancellor therefore concluded that he was not precluded from buying the corporation's stock.

We observe at once that all of this reasoning is based upon the concept that the corporation has a separate existence from the individuals who are its stockholders. For purposes of corporation law this distinction is ordinarily sound, although even in that field the corporate fiction is on occasion disregarded.

But in determining the existence or non-existence of the important relationship of attorney and client a broader approach is required. The question is, What in fact was the relationship between Brown and the three men? This is not a simple case, as defendants' counsel suggests, of an attorney for a corporation investing in its stock.

It is clear to us that Brown was, at the beginning of the venture, and also at its end, the attorney for the three men. The corporation was simply a form for the carrying on of a joint venture. For our present purpose Brown must be regarded as the attorney for three joint adventurers. When they fell out he undertook to resolve their differences. He very properly told them that he could not represent any one of them against another. This was so, not because of the corporate form of the enterprise, but because of the well-settled rule that if a lawyer is retained by two clients and they get into a dispute he cannot ordinarily represent either. Indeed, Brown's justifiable insistence on this neutrality was a recognition, conscious or not, of his fiduciary duty to all three men. That he was acting in his capacity as a lawyer admits of no doubt. Why were they discussing

the matter in his office if not to obtain his help and counsel in their difficulty? In fact it was Brown who succeeded in evolving a possible settlement of the whole matter—a commendable effort.

But by these very acts he had emphasized his role of counselor to the three men. In suggesting the settlement he was discharging a characteristic function of the legal adviser. He could not escape the fiduciary obligations of this relationship by insisting that he was acting only for a corporation.

Upon the failure of his attempt to buy out the other stockholders, Opdyke was left with his claim against Richter for the original 100 shares. Brown knew that Opdyke had such a claim.

When Brown bought the Richter stock, he acquired an interest in the subject matter of the dispute between his clients. It was an interest necessarily adverse to that of one of them—Opdyke. Moreover, even if it be assumed, as the Vice Chancellor found, that the relationship of attorney and client had ceased with the failure of the settlement, yet he is still liable in this case because his knowledge that the stock was for sale was acquired directly from his role as counselor.

What was at stake here was the control of the business. On the face of the record, Richter and Smith had it; but Opdyke claimed it; and Brown, attorney for all three, acquired it without the consent or knowledge of Opdyke.

Possibly Brown may have relied on Richter's statement that the deal was off, indicating that Opdyke was abandoning all his claim. If so, he erred. He could relieve himself of his obligation to Opdyke only by the explicit consent of Opdyke, given after a full understanding of the position and of his legal rights.

Possibly Brown believed that Opdyke had no valid claim against Richter. If so, his belief was immaterial, and the subsequent determination that the claim was without merit is also immaterial.

It seems more likely, however, that he relied on the technical distinction between the corporation and the three men who composed it. But he must have had qualms about his position, for he made a

special point of his desire to be the first to tell Opdyke what he had done.

It is said that after learning of Brown's purchase Opdyke voiced no objection and had no criticism of Brown. His failure to assert his legal rights is of no moment. He was not represented by separate counsel, and he naturally did not realize his legal position. It was Brown's duty to enlighten him, but this duty was not performed.

Counsel have cited to us cases, in Delaware and elsewhere, announcing the applicable principles of law. These principles are so well settled that a discussion of the decisions is unnecessary. For a case condemning the acquisition by a lawyer of an interest in property adverse to that of his client, see In Re *Goldstein, 7 Terry* 450, 46 *Del.* 450, 85 *A.2d* 361. Counsel for defendants does not challenge these principles; his defense is really that the circumstances do not justify a finding that Brown, in counselling the three men, was acting as their attorney. We have already rejected this argument.

Defendants also say the Vice Chancellor's finding that no attorney-Client relationship existed was one fact which we should not disturb under the conflict-of-oral-testimony rule. That rule does not apply, because there is no conflict of oral testimony. The facts above outlined depend on uncontradicted testimony, most of it given by Brown himself. What is in question is the conclusion to be drawn from the undisputed facts.

We regret that a member of our bar has succumbed to the temptation to put his own interest above that of his client. But that he did so we entertain no doubt.

■ The result must be that the Vice Chancellor's judgment dismissing the complaint must be reversed. This, of course, will mean the failure of any claim for damages on the injunction bond, over which he reserved jurisdiction.

■ A judgment should be entered embodying appropriate relief, inter alia, declaring Brown a constructive trustee for Opdyke in respect of the interest acquired by him under sales contract with Richter and the others.

This contract is not before us. It may or may not contain provisions specifying the times of performance. In any event, Opdyke must be afforded a reasonable opportunity to carry it out. The terms of an appropriate order must be settled by the Vice Chancellor.

The cause is remanded to the court below, with instructions to vacate the order of November 8, 1961, and for further proceedings not inconsistent with this opinion.