ELWOOD F. MELSON, JR., and GRACE MELSON,
Appellants,

*vs.*

NATHAN P. MICHLIN, Administrator C.T.A. of the Estate of
Julia Nelling Clay, Deceased,
Appellee.

*Supreme Court, On Appeal, October 5, 1966.*

---

3. *Del.Const.* Art. 1, § 4; Art. 4, § 28; Art. 15, § 7.

240

*William E. Taylor, Jr.,* and *Sotiere S. Kapsalis,* Wilmington, for appellants.

*Nathan P. Michlin,* Wilmington, and *Sydney Finkelstein,* Philadelphia, Pa., for appellee.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

HERRMANN, Justice (for the majority) : By summary judgment granted by the Chancery Court in favor of the plaintiff administrator of the Estate of Julia N. Clay,[1] the defendants Elwood F. Melson,

1. Deceased June 24, 1964, the action being thereafter prosecuted by the administrator of her estate.

Jr. and Grace Melson, his wife, were declared constructive trustees, for the benefit of the plaintiff, of 250 shares of the capital stock of Bethel Convalescent Home, Inc., a Delaware corporation; and they were directed to file an accounting of their operation of the corporation. The defendants appeal. The main thrust of the appeal is the contention that the defendants have been deprived of their right to a trial of issues of material fact.

■ Upon review of summary judgment in favor of the plaintiff, we must view the facts, which were presented by pleadings, interrogatories, and depositions, in the light most favorable to the defendants:

Prior to 1950, Clay had been in business as dietician, cosmetician, and proprietor of a beauty parlor. She opened a nursing home in Media, Pennsylvania, in 1950 and, for nine years, she was its sole owner and operator. In 1959, when Pennsylvania authorities denied a further license until certain property improvements were made, she closed the business, taking five patients to live with her on a farm in Pennsylvania.

In February 1960, Clay purchased the property of Bethel Baptist Church near Wilmington.[2] In July 1960, Clay moved into the Bethel property with her five patients. In September 1961, Clay caused Bethel Convalescent Home, Inc. (hereinafter "Bethel") to be incorporated, and she transferred to Bethel all of her rights in the nursing home in exchange for Bethel's total capital stock of 500 shares.

Early in 1962, Clay applied to the Delaware State Board of Health for a license to operate a nursing home at the Bethel property. The application was denied because of her "history" in Pennsylvania and because of certain mis-statements she had made to the Delaware Board.

In April 1962, Clay was arrested on the charge of operating a nursing home at Bethel without a license. Clay consulted the defendant Elwood F. Melson, Jr., a Wilmington attorney, who agreed to represent her, although she was then unable to pay counsel fees. The Statute (16 *Del.C.* § 1101) required that any nursing home having

2. The purchase price was $39,000. Expenditures for improvements amounted to about $9,000. The property was mortgaged for $27,000.

more than four patients be licensed by the Board of Health. Melson accepted Clay's representation that one of the five residents of Bethel was a handyman and not a patient, and entered a plea of not guilty on her behalf. After trial, Clay was adjudged guilty and fined.

Shortly thereafter, Clay requested Melson to represent her in re-applying to the Board of Health for a license. After visiting the home several times and effectuating changes intended to conform with Board of Health requirements, Melson resubmitted Clay's application on July 18, 1962. The Board denied the license because of an erroneous statement in the application and because of continued non-compliance with certain regulations. The Board made no mention at that time of unfitness on the part of Clay to operate a nursing home.

A few days later, Clay sought Melson's assistance regarding the threatened foreclosure of the mortgage on her Media property. Melson advanced $1,100., the sum required to halt the foreclosure proceedings.

Shortly thereafter, Melson conferred with the Executive Secretary of the State Board of Health, who advised that Clay make the necessary improvements and reapply for a license. This was done.

Melson and Clay appeared at the Board meeting on September 13, 1962. During the hearing, the vice president of the Board stated that Clay was unfit to operate a nursing home, that she would never receive a license in Delaware, and that she should sell out. After the meeting, Clay told Melson she faced financial ruin; that mortgage payments on the nursing home were overdue; that the mortgagee was withholding foreclosure only in the expectation that she would obtain a license. Clay said she did not know where to turn and asked Melson if he would consider a half-ownership in Bethel in exchange for getting the license and advancing needed funds. Within a day or two thereafter, Clay made a similar offer to a member of the Board of Health.

By letter dated September 17, 1962, the Board advised Clay of the license denial for the following reasons:

"The Board felt that the applicant is not suitably qualified in light of past experience. The use of part of a building, namely the first floor of the proposed building, as a nursing home is not looked upon favorably. It would appear that if Mrs. Clay can

dispose of her holdings in this nursing home in a suitable way it would be to her personal advantage."

On September 17, 1962, four days after Clay made her proposal, Melson accepted with certain conditions. He stated the arrangement acceptable to him substantially as follows: that in exchange for 50% of the stock of Bethel, he would loan the corporation the money to make the necessary alterations, obtain the license in his own name, and get the business launched; that to protect his reputation he must have final authority in the conduct of the business; and that, to that end, he and his wife would have to be two of the three directors. Clay agreed immediately; but the agreement was not reduced to writing.

On September 28, 1962, a meeting of stockholders of Bethel was held. Clay, as sole stockholder, elected Melson, Mrs. Melson, and herself as Bethel's three directors. Immediately thereafter, the Board elected Melson president and Clay vice president and secretary. A certificate for 500 shares of the corporation's stock held by Clay was surrendered with Clay's endorsement attesting that she thereby transferred 250 shares to Elwood F. Melson, Jr. and/or Grace E. Melson, and authorized the secretary to transfer those shares on the books of the corporation. Two stock certificates, each for 250 shares and bearing the signatures of Melson as president and Clay as secretary, were then issued to Clay and the Melsons respectively.

During the next three months, Melson worked to bring the nursing home into conformity with Board of Health regulations. He hired contractors, personally supervised the work, and personally expended approximately $6,000. on alterations and other Bethel obligations. Mrs. Melson and her father worked at painting and other renovations. During this period Melson rendered legal services to Clay without fee. He also made additional personal loans to her of approximately $2,350. to relieve financial pressures, such as a worthless check charge and mortgage delinquencies on her other properties.

On January 10, 1963, Melson appeared before the Board of Health and applied for a license in his own name. A question arose at the hearing concerning Clay's participation in the operation of the business. The Board told Melson that it would not grant the license if Clay remained on the premises. Melson stated that Clay would be

off the premises within a month, whereupon he received the Board's verbal assurance that the license would be issued. On the following day, Melson reported to Clay that the Board would grant the license, but that she would have to leave the premises. At first, Clay expressed a willingness to comply; but on the next day, Clay took a very antagonistic attitude toward Melson and accused him of falsifying the Board's position.

On January 14, Clay consulted another Wilmington attorney. Melson went to that attorney's office and attempted to explain the matter. He also tendered a written version of the September agreement which he had prepared. Clay voiced no objection to the contract thus presented other than that it failed to provide that either party would have first option to buy the other's half interest upon death or sale. The attorney refused to advise Clay to sign the agreement and declined to represent her further.

The next day, Clay consulted another Wilmington attorney who referred her to the Censor Committee of this Court. She there filed a complaint against Melson in which she acknowledged the agreement, but asserted that Melson was wrongfully attempting to remove her from Bethel and to bar her from participation in the business.

On January 17, at a conference of the parties arranged to settle the matter, Clay was represented by a Pennsylvania attorney. On January 22, at another meeting of the parties convened for settlement purposes, Clay delivered to the Pennsylvania lawyer, a general power of attorney irrevocable "for any reason whatsoever for a period of six months from the date hereof."

On January 25, Melson received from the Board of Health a license with a letter stating, *inter alia:*

"This license is issued with the following provisions:
"1. That Mrs. Julia Nelling Clay will not serve as an employee in the institution."

On the morning of January 26, Melson and his wife went to the nursing home to assume control of its operation under the license. Melson requested Clay to leave the premises and go to her residence,

less than a mile away. Clay refused. After repeated futile requests made during the course of the day, Melson told Clay he intended to see a magistrate and have her put out. At about 6:00 P.M., Clay and her husband departed.

Following Clay's departure, in order to comply with a regulation that at night one person be on duty and another available, Melson and his wife moved into the nursing home and lived there for six months. In addition to her duties as administrator and records keeper, Mrs. Melson acted as cook and night nurse. During this time, she was on a salary of $500. per month. Though Melson performed services, he received no compensation. Clay was removed as an officer of the corporation in March 1963 after she refused to return corporate papers needed for tax returns.

From time to time, Melson made additional loans to the corporation "in order to keep it going." In time, he arranged for a mortgage for Bethel with a mortgage company of which he was sole stockholder, the only mortgage source available. From the proceeds of that mortgage, Melson paid off the existing mortgage and repaid himself the sums he had advanced.

Melson called no meetings of stockholders in April 1963 or April 1964 because "it was totally impossible to deal with her [Clay] or discuss anything with her." He called no meeting of stockholders after her death because her administrator never evinced any interest. Melson rendered no accounting to either Clay or her administrator until the latter requested it for the first time in September 1965. Thereafter, he provided an accountant's financial statement for the years 1963 through 1965. While he rendered no accounting prior to 1965, Melson was willing to provide Clay and her administrator with any information they wished. The financial statements rendered showed that the corporation had no net profits during the years covered.

These, then, are the facts viewed in the light most favorable to the defendants, as they must be for present purposes.

The Chancery Court held that the stock transfer to the defendants is voidable, and that the defendants hold the stock in trust for the plaintiff. The crux of the decision appears in the following portion of the unreported opinion:

"I am satisfied that in the circumstances appearing Melson's intention at the time of the inception of his business relationship with Clay was in good faith calculated to benefit both Clay and himself. However, in so dealing he placed himself in the position where he might be required to choose between his own interests and those of his client. When the time came he chose his own interests. The odium of his conduct, namely the 'eviction' of Clay and the consequences which followed was a foreseeable result of his having become personally involved. This is particularly so since the attitude of the State Board of Health concerning Clay's participation in the operation of the nursing home was known at the time the transaction was entered into. The case is thus brought within the established principle condemning the acquisition by a lawyer of an interest in property adverse to that of his client. See In re *Goldstein, 7 Terry* 450, 85 *A.2d* 361; *Opdyke v. Kent Liquor Mart, Inc.,* 40 *Del.Ch.* 316, 181 *A.2d* 579. * * *"

█ It is apparent that the Chancery Court made one of two assumptions: either (1) that although not adverse at the outset, Melson's interest later became adverse to that of Clay, and such subsequent conflict of interest was foreseeable; or (2) that the interest acquired by Melson was adverse to that of Clay at the outset. Neither assumption is warranted by Melson's version of the facts, and there are genuine issues of material facts as to both.

As to the first assumption: according to Melson's testimony, he had no reason to foresee, in September, that the Board of Health would bar Clay from the premises in January; and such condition, imposed by the Board for the first time in January, was the real source of the adverse positions in which the parties first found themselves in January. According to Clay's testimony, on the other hand, Melson foresaw the adverse positions which developed in January because he planned it that way from the beginning, his entire course of action from the outset being in accordance with a master plan to oust her from the business. She controverts Melson's assertion that the Board conditioned the issuance of the license upon her removal from the premises.

As to the second assumption: according to Melson's version of the facts, there was no adverse interest when he acquired his stock

in September, although one developed later. Under his version, the plaintiff was in a desperate financial plight, on the verge of losing by mortgage foreclosure not only the nursing home but also her residence and other property in Media; it was essential to the salvation of her financial situation that she obtain a joint adventurer who would be able to acquire the license for the home and advance working capital; and in becoming such joint adventurer, Melson's interests coincided with those of Clay in the salvage operation, the parties working harmoniously together for the common cause until January when, for the first time, the interests came into conflict. In this connection, the Chancery Court stated: "I am satisfied * * * Melson's intention at the time of the inception of his business relationship with Clay was in good faith calculated to benefit both Clay and himself." According to Clay's testimony, on the other hand, she did not invite Melson to become a 50% partner; he volunteered and injected himself into her affairs; she did not agree that Melson have a half interest in, and control of, Bethel; in acquiring such interest and control, Melson fraudulently and deceitfully acted contrary to her interests at the outset, in accordance with his preconceived plan to oust her.

These issues of fact, material to the question of the validity of the stock transfer, may not be resolved in a summary judgment proceeding.[3] They are for decision by the trier of fact after a trial. In support of the motion for summary judgment, the plaintiff had the burden of demonstrating to a reasonable certitude that there are no genuine issues of material fact which, if resolved upon trial in favor of Melson, would absolve him of the charge of impropriety as to the acquisition of 250 shares of stock. Compare *Ebersole v. Lowengrub*, 4 *Storey* 463, 54 *Del.* 463, 180 *A.2d* 467 (1962). In our judgment, the plaintiff has failed to discharge that burden. Accordingly, the issue of the voidability of the stock transfer must be remanded for trial.

For guidance in the trial of the cause, we set forth the following standards and criteria which we think govern the case:

This Court has held that an attorney may·not acquire a property interest which, at its inception, is adverse to that of his client.

---

3. *Chancery Court Rule* 56, fashioned upon *F.R.Civ.P.* 56, provides that summary judgment may be rendered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

In re *Goldstein,* 7 *Terry* 450, 85 *A.2d* 361 (1951); *Opdyke v. Kent Liquor Mart, Inc.,* 40 *Del.Ch.* 316, 181 *A.2d* 579 (1962). We have not had the occasion heretofore, however, to consider the acquisition by an attorney of an interest which was not adverse at the outset but which subsequently became adverse.

 In all relations with his client, an attorney is bound to the highest degree of fidelity and good faith. Strict adherence to this rule of conduct is required by time-honored, deeply rooted concepts of public policy. Since the relationship puts the attorney in a position to avail himself of the necessities of his client and to gain knowledge that can be used to the client's disadvantage, any business transaction between attorney and client is presumptively invalid in law—a presumption that the attorney can overcome only by the clearest and most convincing evidence, showing full and complete disclosure of all facts known to the attorney and absolute independence of action on the part of the client. The burden of proof is always upon the attorney, as a fiduciary, to establish clearly the absence of any taint in the transaction; otherwise it is voidable.

 But an attorney and his client are not under absolute legal disability to contract with each other; nor are all business transactions between them necessarily voidable because of the relationship. By reason of the very nature of the attorney-client relationship, however, a business transaction between attorney and client will be subject to the closest judicial scrutiny, if attacked, and will be upheld only if the attorney is able to sustain the burden of proving that (1) the transaction, at its inception, was not disadvantageous to the client; (2) the transaction was entered into in utmost good faith and with complete fairness; (3) there was full disclosure to the client of the nature and effect of the transaction and of his interests and rights therein; and (4) there was no undue influence exerted by the attorney. See *In re Martin,* 237 *Pa.* 159, 85 *A.* 88 (1912); *In re Gavel,* 22 *N.J.* 248, 125 *A.2d* 696 (1956); *McLean v. Maloy,* 136 *Md.* 467, 111 *A.* 91 (1920); *Baker v. Otto,* 180 *Md.* 53, 22 *A.2d* 924 (1941); *Littleton v. Kincaid* (4 Cir.) 179 *F.2d* 848, 27 *A.L.R.2d* 572 (1950); *Kisling v. Shaw,* 33 *Cal.* 425, 435 (1867); 7 *Am.Jur.(2d)* "Attorneys at Law" § 94, *et seq.;* 7 *C.J.S. Attorney and Client* §§ 126, 127.

 Where the transaction meets these requirements at the outset, what is the consequence of a conflict of interest subsequently arising out of the transaction? The attorney's position depends, in

our judgment, upon the reasonable foreseeability of the particular conflict of interest encountered. If the adversity was such that, in the exercise of reasonable prudence, the attorney should have foreseen it, the transaction is voidable as though adverse at the outset. If, however, the subsequent conflict of interest was not reasonably foreseeable, the attorney must either (1) withdraw forthwith from the attorney-client relationship as being disqualified, or (2) surrender forthwith the adverse interest. He may not continue in both positions; for an adverse interest, whenever or however it may arise, is incompatible with the fiduciary relationship between lawyer and client. But an unforeseeable adverse interest, subsequently arising, should not result in vitiating a transaction which was beyond criticism at its inception. Such result is not required by considerations of either public policy or fairness.

In the light of these guidelines, several issues of material fact appear for decision by the trier of fact. E.g., did Clay ask Melson to accept the 50% interest and salvage the business, or did Melson volunteer and inject himself into her affairs? What was the actual agreement between the parties in September? Was Melson to invest capital or lend money to the corporation? What was the actual value of the business and assets of Bethel in September? Were the details of the transaction fully disclosed by Melson to Clay? Did Clay understand the details of the transaction? Was she tricked into signing the stock certificates and other corporate documents in September? Has Melson performed under the agreement? Did Melson have reason in September to foresee the developments of January? Did the Board actually bar Clay from the premises? Did Melson have reason to believe in September that the Board would not permit Clay to remain on the premises and participate in management under Melson's license? Was the attorney-client relationship terminated at the time Melson "evicted" Clay in January?

Melson claims the right to a trial of such factual issues, and proper findings thereon by the trier of facts, in the determination of the question of the voidability of the stock transferred in September. We agree.

Findings as to disputed facts may not be made by the trial court in a summary judgment proceeding, nor may they be made for the first time by this court on appeal. And this is nonetheless so

because of doubt as to the nature and extent of the evidence which may be adduced at the trial. The so-called *Deadman's Statute*, 10 *Del.C.* § 4302,[4] may constitute an evidentiary problem for Melson at trial if it is invoked by the plaintiff. But we do not think that we are in a position at this stage to speculate as to such problem or as to the type and scope of the evidence which may be available to Melson at the trial upon which he so strenuously insists.

We express no opinion as to the ethical propriety of Melson's conduct in September or January. We hold only that the validity of the September stock transaction, including the effect thereupon of the January events, is for trial.

Accordingly, the summary judgment against the defendants may not stand. The portion of the judgment, declaring the defendants constructive trustees of the 250 shares for the benefit of the plaintiff, is reversed and the issue of the validity of the stock transfer is re-manded for trial. There is no question, as we understand it, as to the obligation of the defendants to account to the plaintiff with respect to the operation of the business since 1963. That portion of the Order of the Chancery Court is affirmed. Also affirmed is the denial of the defendants' motion for summary judgment because, as has been demonstrated, there are genuine issues of material fact which must be determined by the trier of fact.

Wolcott, Chief Justice (dissenting) : I concur in the rule of law announced by the majority to the effect that any business transaction between attorney and client is presumptively invalid in law, and that the presumption of invalidity may only be overcome by the attorney by showing by the clearest and most convincing evidence that he made full and complete disclosure of all the facts and that there was absolute independence of action on the part of the client.

I disagree, however, with the action of the majority in sending this cause back for trial. I cannot agree by reason of 10 *Del.C.* § 4302,

---

4. 10 *Del.C.* § 4302 provides in part as follows :

"* * * In actions or proceedings by or against executors, administrators or guardians in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any trans-action with or statement by the testator, intestate or ward, unless called to testify thereto by the opposite party."

which prohibits a party in any action by or against an administrator from testifying as to any transaction with the intestate.

This statute, I believe, would prohibit either of the appellants from testifying as to what took place between Julia Nelling Clay, the client, and the Melsons. Since the issues of fact which the majority now want resolved after full trial could only be determined upon the testimony of the Melsons and Mrs. Clay, and since Mrs. Clay is now dead and represented in this cause by her administrator, it seems to me nothing more can be produced upon these issues than is now before us.

Consequently, a remand for trial, in my opinion, is only a useless and time-consuming gesture. We should decide the cause upon the record before us.