**In the Matter of DEEMER STEEL CASTING CO., INC., a Delaware corporation, Debtor.**

**DEEMER STEEL CASTING CO., INC., Plaintiff,**

v.

**LEBANON FOUNDRY AND MACHINE COMPANY, Defendant.**

**Bankruptcy No. 87–28.**
**Adv. No. 88–59.**

United States Bankruptcy Court,
D. Delaware.

July 19, 1990.

Charlene D. Davis, Bayard, Handelman & Murdoch, P.A., Wilmington, Del., for debtor, plaintiff.

Stanley W. Katz, Davis, Katz, Buzgon, Davis, Reed & Charles, Ltd., Lebanon, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

Deemer Steel Casting Co., Inc. asserts it is entitled to a recovery against Lebanon Foundry and Machine Company for breach of an oral agreement, or alternatively, under quasi-contract. The dispute centers about a purported post-petition sale by Deemer to Lebanon of estate property. As such, it is a core proceeding and final judgment may be entered by this court. *See In re Sarasota Casual, Inc.*, 90 B.R. 496 (Bankr. M.D. Fla.1988); *In re National Equipment & Mold Corp.*, 71 B.R. 24 (Bankr. N.D. Ohio 1986).

The procedural posture of this adversary proceeding is a long and tortured one. Deemer initiated this action in August 1988; Lebanon answered in September. In December, the parties reached a settlement. That settlement fell through; and, several months later, Deemer requested a trial date. Thereafter, discovery problems arose. Then, a witness' serious heart condition required his being excused from testifying at trial and his deposition had to be arranged. Trial was held August 17 and 18, 1989.

The following facts and law support a ruling in Deemer's favor.

## BACKGROUND

One of Deemer's principal assets was its worldwide marine hardware business. It had been a leading source of custom castings for the maritime industry since 1910 but was not operating at the time of its Chapter 11 filing because of labor and senior management's health problems. Its president, Robert Dick, was attempting to sell the foundry as a going concern or its assets to fund a liquidating plan. In response to Dick's solicitations, A. Albert Broslow, president of Lebanon, telephoned Dick in February of 1987 expressing interest in purchasing the marine hardware assets.

Harvey Redmond, Deemer's vice president of engineering, then spoke by phone with Frank Watts, an employee of Lebanon, about generating additional business for Lebanon as well as the possibility of his obtaining employment with Lebanon. Redmond subsequently visited Lebanon's plant. He discussed with Broslow and Watts a possible position for him at Lebanon, the prospects of Lebanon acquiring Deemer's marine hardware business, and other business matters such as Deemer's annual gross sales. Redmond arranged for Broslow and Watts to visit the Deemer facility in March of 1987.

As scheduled, Broslow and Watts arrived at the Deemer foundry the late morning of March 25. Broslow and Redmond claim they, together with Dick and Watts, went to lunch and discussed some preliminary aspects of Lebanon acquiring Deemer's marine hardware business and giving Redmond a job. Upon returning from lunch, the visitors toured the foundry. Dick does not recall meeting Broslow or Watts at that time and is certain he did not have lunch with them. Under either version, it is clear there was only a general discussion about Lebanon's acquisition of Deemer's business.

Approximately one week later, Watts, at Broslow's behest, called Redmond to arrange for Dick and Redmond to visit Lebanon for the purpose of working out a deal. Redmond and Dick drove to the Lebanon foundry and discussed proposed terms during the drive. After arriving at Lebanon, the four men drove to a Myerstown restaurant for lunch. Dick and Broslow have

differing recollections of subsequent events.

Dick claims that an oral agreement was reached after he outlined his proposed terms during lunch. His terms of sale for Deemer's marine hardware and customer lists were $25,000 up front, 5% on the marine hardware business' gross sales for five years, and 3% of other sales generated from former Deemer customers for three years. Broslow allegedly responded that he was short of cash but expected money in late June and eventually said something similar to, "If I could pay this $25,000 in July or late June or July, we got a deal." The modification was accepted along with the understanding that Redmond would be hired by Lebanon to run the marine hardware business. No further negotiations, meetings, or other discussions subsequently took place regarding this matter.

Broslow claims that no terms were discussed at lunch except possibly Deemer's sales and costs. After returning to the Lebanon facility, he and Dick discussed the proposed deal during which Broslow said he was willing to pay 3% of sales from Deemer's customers (other than marine hardware sales) for three years, but no agreement was struck as to the $25,000 up front nor the 5% for five years from Deemer's marine hardware business.

Redmond did not recall whether there were any business discussions at lunch other than discussions about Lebanon employing him. Watts is deceased.

Despite the conflicts as to when a discussion took place, Broslow and Dick at some point during that visit went through a series of payment terms for Deemer's marine hardware patterns and goodwill. After that meeting, Dick gave Redmond permission to begin shipping Deemer's patterns for casting the hardware to Lebanon. Actually, delivery of patterns began two days after Broslow and Watts' visit to Deemer's foundry on March 25. Another delivery was made April 24.

Redmond terminated his employment with Deemer on June 1, 1987, and commenced working for Lebanon. Nevertheless, Redmond continued to visit the Deemer facility several times a week and acted as a liaison for the transition of the marine hardware business. Occasionally, Redmond would select patterns at the Deemer plant and transport them in the trunk of his car to Lebanon. On one occasion, Redmond rented a truck and with the help of William Tracy loaded it with patterns and shipped them to Lebanon. The patterns selected and shipped by Redmond were in good condition—not rotted, split, or cracked. Overall, Redmond transferred about one hundred patterns from Deemer to Lebanon.

Deemer referred inquiries and orders regarding the marine hardware items to Redmond or Lebanon. On at least two occasions where Deemer referred customers but was paid directly by them, Deemer retained 5% of the purchase price. Lebanon acknowledged the propriety of this practice by negotiating Deemer's check for 95% of the purchase price. Moreover, Redmond knew Deemer's main customers and some large accounts were moved to Lebanon due to his efforts.

In late July of 1987, Dick asked Redmond for the $25,000 payment. Redmond told Dick that he was recording all sales in which Deemer was entitled to a percentage but that Lebanon was a little short of cash. In October, Dick's telephone calls to Broslow went unanswered. Again, Dick turned to Redmond who said Broslow was doing a lot of traveling. In December 1987, Dick drafted a handwritten memorandum of his understanding of the April oral agreement. Redmond acknowledged that the terms were essentially those Dick proposed in April 1987 and he delivered the memorandum to Broslow who said that the memorandum was "close" to their discussion. There was no response to the memo nor did Lebanon send any payments to Deemer.

After Redmond's transfer of the patterns to the Lebanon facility, the items were logged in, stored, rigged, mounted, and used in Lebanon's marine hardware business. Broslow and two Lebanon employees testified that the patterns were in poor condition which necessitated extensive repairs. Nevertheless, it was admitted that

every pattern had to be rigged in its new location. Still, Lebanon's marine hardware business generated gross sales of $418,-807.00 from April through December 1987 and $194,569.45 from January through July 1988. This total comes to $613,376.45 for the entire period. Lebanon shut down its marine hardware business in July of 1988. No payments were ever made by Lebanon to Deemer.

## CHOICE OF LAW

■ In cases sounding in contract, Delaware's conflicts of law rules require application of the law of the state with the most significant contacts. *McIntosh v. Arabian American Oil Co.*, 633 F.Supp. 942, 945 (D. Del.1986). *See also* Restatement (Second) of Conflict of Laws § 188 (1971). The Restatement factors, such as place of contracting, performance, and the location of the contract's subject matter, dictate that Pennsylvania law governs resolution of this dispute. Since both states have adopted the Uniform Commercial Code, choice of law has minimal impact on the contract issue. Federal equity principles control in determining Deemer's demand for attorney's fees. *See In re Swofford*, 112 F.Supp. 893, 894 (D.Minn.1952).

## STATUTE OF FRAUDS

■ Article Two prevents enforcement of contracts for the sale of goods in excess of $500 unless there is a writing signed by the party to be charged. 13 Pa.Cons.Stat. § 2201(a). Nevertheless, where goods are received and accepted, an oral contract is enforceable under 13 Pa.Cons.Stat. § 2201(c)(3). *See also Woodward & Dickerson, Inc. v. Yoo Hoo Beverage Co.*, 502 F.Supp. 395 (E.D.Pa.1980).

Though defendant Lebanon does not assert the statute of frauds as a defense, it argues vehemently that the terms of an agreement were never concluded and the conduct of the parties did not recognize the existence of any contract.

## CONTRACT

■ In order for a contract to be formed, there must be a mutual manifestation of assent to the same terms reflecting an agreement. Typically, this mutual as-

sent is ordinarily established through a process of offer and acceptance. *See Hahnemann Medical College & Hospital v. Hubbard*, 267 Pa.Super. 436, 406 A.2d 1120 (1979). But, it is still possible to have mutual assent despite the fact that it is impossible to identify the offer and the acceptance. Restatement (Second) of Contracts § 22 comment a (1981). Moreover, under the Pennsylvania version of the U.C.C., a contract may be found "even though the moment of its making is undetermined." 13 Pa.Cons.Stat. § 2204(b). Here, an offer was made by Dick sometime during his Lebanon visit in April 1987. Dick's purpose in making the trip was to propose a sale of Deemer's marine hardware business, primarily patterns and customer lists, as well as other goodwill in non-marine hardware divisions of Deemer. Broslow confirms that Dick's memo memorializing the meeting closely reflected the terms of Dick's offer. Although he resolutely denies that he accepted the offer, the conduct of the parties subsequent to the April meeting is sufficient to form a binding agreement. 13 Pa.Cons.Stat. § 2204(a). *See* Restatement (Second) of Contracts § 19(1) (1981) ("manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act.").

■ Under Pennsylvania law, an offeree's act of dominion over an offeror's goods is referable to a power of acceptance. *F.W. Lang Co. v. Fleet*, 193 Pa.Super. 365, 165 A.2d 258 (1960); *Indiana Manufacturing Co. v. Hayes*, 155 Pa. 160, 26 A. 6 (1893). Lebanon not only accepted Deemer's goods, repaired, rigged, and adapted them to commence its own marine hardware business but also hired Redmond who acted on behalf of Lebanon. 13 Pa. Cons.Stat. § 2606(a)(2)–(3). Even assuming Broslow's version that there were no direct or explicit words sufficient to contract at the April meeting, this conduct would result in acceptance of the offer. Lebanon's behavior in repeatedly taking and keeping the patterns implies that either Broslow accepted Dick's verbal offer at the April 1987 meeting or—more likely—Lebanon

subsequently accepted that offer by procuring and keeping the subject goods.

Lebanon also argued that even if there was an agreement, it would fail for indefiniteness and because the warranties of merchantability and fitness for a particular purpose were breached.

As to the indefiniteness argument, § 2204(c) of 13 Pa.Cons.Stat. mandates that a contract not fail because one or more terms are left open provided that the parties intended to contract and there is a reasonable basis for giving an appropriate remedy. In addition, the U.C.C. provides numerous "gap-fillers" to supplement contracts that lack a definite price, date of delivery, place of delivery, warranties and so forth. Dick's payment terms, various percentages of gross sales plus $25,000 in exchange for all the Deemer marine hardware patterns and its goodwill, was definite. Redmond's role negated any open terms. Deemer performed its end of the bargain.

Turning to the implied warranties claims, Section 2607 of the Pennsylvania Commercial Code requires the buyer to give the seller notice *within a reasonable time* after the buyer discovers or should have discovered the breach. Pa.Cons.Stat. § 2607. Lebanon did not notify Deemer of any claim of the patterns' unmerchantability or unfitness for their intended purpose. Lebanon made some repairs, commingled them with its own equipment, and rigged them for use and used them in its own facility. Thus, Lebanon cannot successfully assert breach of warranty to avoid payment.

A contract having come into existence, Lebanon is obliged to pay Deemer $25,000 cash and 5% of Lebanon's marine hardware sales over five years. Since Lebanon shut down its marine hardware business in July 1988, damages can be calculated as follows: $25,000 plus $30,668.82 (5% of $613,376.45, Lebanon's gross sales) for a total of $55,-668.82. Deemer is entitled to pre-judgment interest at Pennsylvania's legal rate on the $25,000 from July 31, 1987, and on the balance of $30,668.82 from July 1988. The evidence does not support an award for goodwill or non-marine hardware sales.

### Quasi–Contractual Recovery

Having found that a contract existed, the quasi-contractual doctrine of unjust enrichment is inapplicable. *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987). Yet, it should be noted that Deemer would be entitled to recover in quasi-contract if no contract in fact had been found.

A quasi-contract is a contract implied in law rather than one implied in fact. *Ragnar Benson, Inc. v. Bethel Mart Associates,* 308 Pa.Super. 405, 454 A.2d 599 (1982). A quasi-contractual obligation is imposed by law to give value for a benefit conferred when it appears that the benefit was not intended as a gratuity and is imposed without regard to the consent of the party bound. *McGrath v. Dravo Corp.,* 183 F.2d 709 (3d Cir.1950); *Weiner v. Bank of King of Prussia,* 358 F.Supp. 684 (E.D. Pa.1973).

Applying these fundamental principles of restitution to the facts, Deemer conferred a benefit on Lebanon which it did not return by any payment or consideration (except for Lebanon's hiring of Redmond). Lebanon was unjustly enriched when it appropriated through Redmond Deemer's property and realized over $600,000 in gross sales from that property. Under this theory of recovery, damages would be based on the estimated value of the goods which ranged from $500–$10,000 per pattern. Applying the low end of this range and multiplying by 100, the approximate number of patterns delivered and accepted by Lebanon, the estimated damages under quasi-contract would be in the same ballpark as the contract damages. In sum, restitution principles provide an alternative basis for Deemer's recovery if no contract had existed.

### Deemer Not Entitled to Counsel Fees

In situations where a party hinders the orderly administration of a bankruptcy estate, equitable considerations may require the court to award attorney's fees

to offset the party's bad faith. *See In re Swoffard*, 112 F.Supp. 893, 895 (D.Minn. 1952); *In re Saltenberger*, 61 B.R. 1005, 1006 (Bankr.E.D.Pa.1986). Deemer claims that because of Lebanon's bad faith actions in appropriating property of the estate, causing excessive delays and increasing costs in resolution of the action, Lebanon should be responsible for its counsel fees. However, Deemer contributed to the problem. As a debtor-in-possession, Deemer did not comply with the Bankruptcy Code and Rules in making its sale with Lebanon. Deemer did not follow § 363(b) of the Code which permits a trustee or debtor-in-possession to sell property of the estate out of the ordinary course of business *only after* notice and hearing. *See also* Bankr. R. 6004. Creditors and other parties in interest had no opportunity to object to the proposed sale, and the court never approved or otherwise ratified the sale.

This lawsuit is a classic example of the problems that can arise when the Code and Rules are ignored by a freewheeling debtor-in-possession. Though Dick had well-meaning intentions for getting a fair price for Deemer's assets, personal friendship with Redmond unquestionably factored into the consideration and complicated the deal. In fact, Redmond as an officer of the corporate debtor at the beginning of negotiations breached his fiduciary duty to Deemer by dividing his loyalties between Deemer and Lebanon. Had Deemer followed the law and bankruptcy procedures, this cause of action most likely would have been averted. Accordingly, Deemer is not entitled to recover attorney's fees from Lebanon.

An order in accordance with this Memorandum Opinion is attached.

## ORDER

AND NOW, July 19, 1990, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT judgment is entered in favor of Deemer Steel Casting Co., Inc., Plaintiff, and against Lebanon Foundry and Machine Company, Defendant, as follows:

$25,000 with interest at the Pennsylvania legal rate from July 31, 1987;

$30,668.82 with interest at the Pennsylvania legal rate from July 31, 1988;

together with interest on the total amount from July 19, 1990.