**In the Matter of Josef A. BURGER and Vera L. Burger, Debtors.**

**Josef A. BURGER and Vera L. Burger, Plaintiffs,**

v.

**LEVEL END DAIRY INVESTORS, Defendant.**

**Bankruptcy No. 89–376.
Adv. No. 89–94.**

United States Bankruptcy Court, D. Delaware.

April 3, 1991.

---

896

**897**

John J. Schreppler, II, Charlene D. Davis, Wilmington, Del., for plaintiffs.

Elwyn Evans, Jr., Jane W. Evans, Wilmington, Del., for defendant.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

Debtors Josef and Vera Burger (Burger) initiated this adversary proceeding by objecting to Level End Dairy Investors' (Investors) proof of claim and seeking the turnover of feed monies owed by the Investors. The Investors answered and counterclaimed against Burger for their losses alleging breach of contract premised on his failure to meet the requisite standard of care under the services contract. This dispute focuses on the parties' business relationship regarding a dairy herd which was owned and financed by the Investors while Burger managed the day-to-day affairs of the herd. Jurisdiction of this court is based on 28 U.S.C. § 1334, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (C), and (E).

## BACKGROUND

Burger filed a voluntary petition under Chapter 12 of the Bankruptcy Code on June 29, 1989. Chapter 12 affords special protection to family farmers with regular annual income in a financial rehabilitation scheme analogous to Chapter 13 but with higher debt ceilings. The financial statements and schedules subsequently filed with the court list a $7,000.00 debt owed to the Investors as well as a contingent and unliquidated claim for $20,000.00 against the Investors. On August 16, 1989, the Investors through their attorney-in-fact, Johannes R. Krahmer, Esquire (Krahmer) filed a proof of claim seeking $109,348.00 damages due to Burger's alleged breach of the services contract. Thereafter, Burger commenced this adversary proceeding on September 9, 1989 objecting to the Investors' claim and seeking to reclaim about $20,000.00 for feed monies allegedly owed by the Investors. The resolution of this dispute hinges upon the interpretation of the instruments governing this business relationship, especially the services agreement, in view of the circumstances sur-

rounding this transaction and business venture.

Josef Burger had emigrated from Germany in 1951 and commenced with his father a joint dairy operation in Delaware around 1961. In 1972, Burger acquired the complete interest in Level End Farm from his parents and took over all the farm operations. Sometime in 1974, Burger installed a modern milking facility called a "milking parlor", but had problems with this system from the outset. Eventually, Burger was referred by a neighbor to Frances Biondi, Esquire (Biondi) concerning the problems with the milking parlor, and after consultation, Biondi advised Burger that the statute of limitations had expired on the contract of warranty for the system. At this time, Biondi was practicing law at Biondi & Babiarz located on King Street in Wilmington. Later, in 1979, Burger consulted Biondi concerning his father's will and regarding financial matters whereby Biondi suggested Burger obtain a FmHA loan. On July 1, 1979, Biondi and his law partner, John Babiarz, joined the law firm of Morris, Nichols, Arsht & Tunnell. Krahmer, who is a Delaware attorney specializing in tax law and estate planning, had been a member of this firm since September of 1964.

In 1981, Biondi informed Burger that a partner at his firm was interested in investing in a dairy operation for tax write-off purposes. This prompted Burger's interest and, subsequently, Burger met with Krahmer to discuss the terms of the proposed venture. Krahmer wanted to initiate a tax shelter for a consortium of investor-subscriber clients to take advantage of the favorable treatment given to dairy investments which included, *inter alia*, tax credits and depreciation deductions. After some negotiations, Burger generated certain projections upon Krahmer's request concerning the prospective milk revenues and the growth of the dairy herd. These projected figures estimated by Burger predicted an upward trend over the term of the proposal.

On August 3, 1981, Burger and Krahmer entered into the Services Agreement which was the centerpiece of their business arrangement. The contract was drafted by Krahmer and did not expressly reference the projections calculated by Burger. In the agreement, Burger promised to assist Krahmer in purchasing the herd for $150,-000.00 and to manage, maintain, and expand the herd as well as to improve its quality. In addition, the Investors were to contribute another $10,000.00 for the acquisition. As part of the deal, Krahmer agreed to pay all feed and upkeep expenses while Burger would pay over all milk revenues and any sale proceeds from bulls or cull cows. As an incentive, Burger was entitled to 50% of any annual cash revenues once the Investors had been allocated an amount equal to a 15% annual return on their investment before legal fees. Upon the total or partial liquidation of the herd, Burger would receive 15% of the surplus over the original purchase price as an added incentive. Furthermore, the contract contained a consultation provision which provided that "Burger and Krahmer agree to meet on a regular basis to discuss operations ... as well as any other matters of importance relating to operation of the Herd." Finally, the Services Agreement was to continue until the total liquidation of the dairy herd or the death of Josef Burger.

Along with the contract, the same parties executed a lease agreement for a seven-year term wherein the Investors, per Krahmer, would pay $4,000.00 a month rent (paid in bimonthly installments) for keeping the herd at the Level End Farm. The seven year period was inextricably linked to the Services Agreement due to the Investors' depreciation considerations and was the anticipated time for total liquidation of the herd. The lease also expressly prohibited Burger from maintaining any other dairy livestock except that owned by the Investors. Lastly, the lease contained various standard provisions allotting various duties and charges concerning the property between Burger and Krahmer.

The Investors were comprised of four private individuals and Krahmer. These persons were solicited by Krahmer and Biondi who promoted this dairy venture as

a good, solid investment with favorable tax benefits. Shortly before entering into the agreement, Krahmer circulated a memorandum dated July 15, 1981, which outlined for potential investors the general proposal with Burger and included a business magazine article discussing the subject. *See* Barnfather & Schriber, *Forbes* "Milking the Taxman" (June 8, 1981). The memo discussed the positive aspects of dairy investments, but also noted that "[t]here are many imponderables in the dairy business." The memo then goes on to recite a number of these imponderables including the uncertain ratio of cow and bull offspring, the impossibility of predicting feed and milk prices, and "the possibility of deaths in the herd which may exceed normal statistical percentages." In addition, on the subscription agreement form included with the memorandum, each potential investor acknowledged that "I understand that there are substantial risks in this investment and am prepared to accept them." Eventually, five persons invested with an unequal breakdown in sharing in the investment: two individuals took one-fourth interests and the remaining three, including Krahmer, took one-sixth interests in the venture. Throughout the entire period spanning the agreement, Krahmer kept in touch with the Investors through written memos and apprised them generally of the events concerning the dairy operation as well as relevant tax information pertaining to their investment.

After entering into the Services Agreement, Burger acquired approximately 120 head of unregistered cows for the Investors with 58 coming from his own herd and the remainder coming from Harry Rudnick & Sons. Based on Krahmer's instructions, Burger spent only $100,000.00 on milk producing cows and, therefore, purchased a large percentage of heifers (cows not yet producing milk) specifically because of the Investors' tax considerations. However, some of the cows had uterine infections which caused a calf mortality rate of roughly 75–80%. Burger attempted to contain the outbreak of disease and contacted Dr. Michael Forney, a veterinarian from the Chestertown Animal Hospital, to treat the sick animals. Dr. Forney and his two other associates visited the Burger farm on numerous occasions during the 1981–82 period, but despite their efforts, some animals died. In addition, the herd had a high number of bull calf offspring around this time and this shifted the male-female ratio of cattle dramatically. Meanwhile, Krahmer had assisted Burger in obtaining refinancing since there was an apparent blanket lien against Burger which adversely affected the milk revenues due the Investors. Since Krahmer believed Burger benefitted from his work, Krahmer sent Burger a bill for attorney services in late 1982. In 1983, the dairy herd did not rebound as was hoped and its population had been reduced to the neighborhood of 90 head. Based in part on Burger's recommendation and the predicted lull in the operation (based on Burger's 1981 projections), Krahmer went to the Investors again to raise additional capital in order to rejuvenate the entire dairy project by purchasing more cows.

On August 17, 1983, Burger and Krahmer amended the lease agreement agreeing that the Investors would infuse an additional $40,000.00 for the purchase of additional cows, but in return, they were accorded an option to terminate the lease after 30 days notice if during any six month period expenses exceeded revenues. Unfortunately, some of the next batch of cows purchased with these funds from Rudnick were diseased with pasteurella and a number of cows died. Although there was some dispute as to the chronology in containing the outbreak, Krahmer eventually settled this matter with the Rudnicks' counsel for five heifers of his choice even though his calculations show $7,274.18 in direct losses and $36,200.00 in indirect losses. Yet, in correspondence involving the settlement, Krahmer characterized Burger's efforts in containing the pasteurella as "superhuman". Nevertheless, this second blow stunted growth of the herd further and set back milk production far from the original projections.

During this time, Burger had commenced almost $200,000.00 in capital improvements

to his farm, including the installment of a feed system and a Slurrystore storage and fertilizer system, the latter of which developed problems. Significantly, the relationship between Krahmer and Burger appeared to deteriorate around 1984 as the dairy operation failed to keep track with Burger's original projections. Toward the end of 1984, Burger wrote a letter to Krahmer pleading for additional financial help; nevertheless, Krahmer insisted that farm expenses be paid out of milk income and this decision began to strap Burger for cash. At this point, the herd was at 189 head with 101 milk producers. Milk production gradually rose and peaked in 1985 but then tapered off some thereafter. Burger did have problems with mastitis and high semantic cell counts in the milk but was able to keep them under control. However, in order to conserve cash, Burger cut back on certain expenses such as veterinarian calls, artificial insemination, special grades of feed, and other items. Throughout the latter part of the lease, the dairy operation produced a marginal cash flow except for one year where it lost money while the cattle count stayed more or less constant. After the loss of a farm hand in 1987, Burger labored seven days a week until he received an injury in 1988 which incapacitated him for several weeks. The lease term expired on its own terms August 31, 1988, but Burger maintained custody of the herd after the lease terminated.

On or about September 1, 1988, Krahmer and Burger entered into a so-called "Termination Agreement" which gave Burger the option to purchase the Investors' herd for $120,000.00. Since the Services Agreement was tied into the original lease, it had already expired on its own terms on August 31, 1988, and this agreement could not modify or otherwise affect the original services contract. The Termination Agreement did not obligate Krahmer to pay rent for the herd's use of the premises nor was Burger obligated to account for milk revenues. Essentially, the agreement allowed Burger the opportunity to purchase the herd provided that Burger pay interest of $1,000.00 per month on the prorated interest of the purchase price. After December 1, 1988, Krahmer had sole discretion to terminate the agreement which he exercised by notifying Burger by letter on April 21, 1989. The $7,000.00 undisputed debt in favor of the Investors listed on Burger's statements and schedules involve the unpaid interest arising out of this agreement.

On May 22, 1989, the herd was sold at public auction by Harry Rudnick & Sons yielding gross proceeds of $103,625.00. About 190 head of cattle were sold, including roughly 100 heifers and 90 producing cows. After Rudnick's commission was deducted, the net yield was $92,452.00 which was turned over to the Investors. Burger filed bankruptcy approximately one month later.

## DISCUSSION

■ This dispute on the Investors' and Burger's respective claims focuses on the interpretation of the Services Agreement and related documents in light of the facts evolving from this business venture between Burger and the Investors. Allowance or disallowance of a claim in a bankruptcy case is governed under § 502 of the Bankruptcy Code, but when such a claim is grounded on an alleged breach of contract, the validity of the claim is ascertained with reference to the law where the operative facts occurred. *In re Oscar Nebel Co.*, 117 F.2d 326, 327 (3d Cir.1941). The Services Agreement is clearly governed by Delaware law because the situs of the services, place of contracting, and other nexuses indicate that Delaware law should apply even though the agreement does not expressly state which law governs. *See McIntosh v. Arabian American Oil Co.*, 633 F.Supp. 942, 945 (D.Del.1986). The Lease Agreement is also controlled by Delaware law, and this is directly supported by paragraph 16 of the instrument which states Delaware law governs. Naturally, all the executed instruments should be treated harmoniously. *See Pauley Petroleum, Inc. v. Continental Oil Co.*, 43 Del.Ch. 366, 231 A.2d 450, 456 (1967). In this instance, the Services Agreement is the main instrument evidencing the parties' understanding and contains the pertinent language controlling

the standard of care and other key issues in this case. Therefore, it will serve as the primary guide for ascertaining the contractual intent of the parties though its construction may be tinted by related documents. Nevertheless, it appears that the Services Agreement was not a totally integrated contract because certain terms are somewhat general and vague. Thus, parol evidence is admissible in interpreting the ambiguous terms in the contract. *Scott–Douglas Corp. v. Greyhound Corp.*, Del. Super. 304 A.2d 309, 315 (1973).

In essence, this case raises four issues: (1) whether the Investors' claim is barred by the statute of limitations; (2) whether Burger breached the contract by failing to meet the standard of care set forth in the services agreement; (3) whether the contract is voidable by Burger because it created an impermissible conflict of interest with Krahmer, a Delaware attorney, under the surrounding factual circumstances of this dispute; and (4) whether Burger may recover for feed monies under the contract. The court will also briefly address the issues of alleged Rule 11 sanctions, attorney's fees, and prejudgment interest.

### The Statute of Limitations Is Not Applicable on a Continuous Contract or Mutual Running Account

Prior to trial, Burger was granted leave to amend the pleadings to include the statute of limitations as an affirmative defense. Burger contends the Investors' claim is barred by the statute of limitations, specifically 10 *Del.C.* § 8106, which provides a three-year period for filing certain actions, including suits for breach of contract. The Investors counter this position by first arguing that the statute did not run until the time of performance under the contract expired. In addition, they characterize the contract as a "mutual and running account" under 10 *Del.C.* § 8108 which, in effect, tolls the general statute of limitations so long as such an account remains open and current. Finally, the Investors argue that Burger fraudulently concealed his contractual negligence thereby tolling the statute.

In most instances, the bankruptcy court will apply the law where the debtor resides or the place where contract took place in applying any statute of limitations. The Delaware statute of limitations applies since it is where the debtor resides as well as where the contract was made and performed; consequently, Delaware decisions interpreting the statute should be followed. *See Bell v. John H. Giles Dyeing Machinery Co.*, 37 F.2d 482, 484 (3d Cir.1930). Under the Bankruptcy Code, the statute of limitations will be tolled until the termination of the automatic stay if the prescribed statutory period has not yet expired prior to the bankruptcy filing. 11 U.S.C. § 108(c). *See also In re Morton*, 866 F.2d 561, 565–567 (2d Cir.1989). Nonetheless, if the period has already expired before the bankruptcy petition was filed, then this provision does not operate to preserve the cause of action and, thus, the action expires in accordance with state law. In the present case, the petition was filed on June 29, 1989, and this is the measuring date as to whether the statute's time had run out or not.

The initial and key question underlying Burger's statute of limitations defense is when did the statute of limitations begin to run for breach of the services contract. The general statute of limitations for contract actions is set forth in title 10, section 8106 of the Delaware Code which provides for a three-year limitation period on contract actions. Burger points to the Investors' allegations constituting breach of contract which occurred sometime between 1981–1983. The Investors contend that Burger's breach was ongoing in that he failed to expand the herd and committed other breaches of the Services Agreement which were continuous until the contract expired. Under Delaware law, a cause of action for breach of contract accrues at the time of the breach. *Hood v. McConemy*, 53 F.R.D. 435, 444–45 (D.Del. 1971); *Bradford, Inc. v. Travelers Indemnity Co.*, Del.Super., 301 A.2d 519, 524 (1972); *Nardo v. Guido DeAscanis & Sons, Inc.*, Del.Super., 254 A.2d. 254, 256 (1969). However, the statute of limitations

does not typically run against a continuing cause of action until the termination of the contract. *See Thorpe v. Schoenbrun,* 202 Pa.Super. 375, 195 A.2d 870 (1963). Therefore, in cases of continuous contract and continuing breach, the statute begins to run only when full damages can be ascertained and recovered. *Oliver B. Cannon & Son, Inc. v. Fidelity & Casualty Co. of New York,* 484 F.Supp. 1375, 1390 (D.Del. 1980). Here, there was a continuous contract for a fixed seven-year period where full and complete damages could not be determined by either party until the end of that time. Moreover, any claim by the Investors for damages necessarily relies on the liquidation of the herd which, under the terms of the contract, was scheduled to take place on or about September 1, 1988. Furthermore, this contract was continuously acknowledged by both parties throughout the seven-year period by the various payments made between the parties. These payments toll the statute because a new promise to pay is implied therefrom. *Levin v. Diamond State Poultry Co.,* 175 F.Supp. 851, 854 (D.Del.1959).

▇▇▇▇ Finally, this contract is a mutual and running account under title 10, section 8108 of the Delaware Code which tolls the general three-year statute of limitations "while such account continues open and current." A mutual account is an account upon which items on either side of the ledger reciprocally offset so that the balance between the two may be determined. *Brown v. Consolidated Fisheries Co.,* 165 F.Supp. 421, 423 (D.Del.1955). The fact that the parties have cross-demands is not sufficient to constitute a mutual account; there must be two sides of the account linked or connected in some way by an express or implied agreement which shows the parties contemplated the reduction of the entire account to one balance which would be so adjusted. *Id.* Burger's obligations concerning paying over milk and other revenues served as one side of the account, and the Investors' obligations to pay feed monies and rent served on the other and, consequently, this tolled the statute of limitations pursuant to § 8108. Having found the statute tolled,

the court need not address the Investors' "concealment" theory. As a result, Burger's affirmative defense based on the statute of limitations must be rejected.

*Burger Abided by the Contractual Terms and Did Not Breach the Standard of Care Under the Services Agreement*

▇▇▇▇ Krahmer's proof of claim on behalf of the Investors seeks $109,348.00 from the estate which amounts to the Investor's total losses from their dairy investment, i.e., capital contributions for purchase of the herd and working capital minus the gross sale price of the herd (including Rudnick's auctioneer commission). The proof of claim is *prima facie* evidence of a debt and creates a presumption of validity which must be objected to and rebutted by some showing of evidence. *See* 11 U.S.C. § 502(a). Once this presumption is overcome, the burden shifts back to the claimant who bears the ultimate burden of persuasion to establish by a preponderance of the evidence that the claim is valid. *In re Farmer's Co-Op of Arkansas and Oklahoma, Inc.,* 43 B.R. 619, 620 (Bankr.E.D. Ark.1984). The Investors' proof of claim is for an unsecured, liquidated amount based on Burger's alleged failure under the Services Agreement to properly assist Krahmer in choosing the herd and mismanagement in expanding the herd and improving its quality. Burger produced sufficient evidence at trial to refute the presumption of validity based on the Investors' proof of claim and, therefore, the burden of proof shifts to them to prove their contract claim against Burger.

The crux of the Investors' claim is twofold: (1) that Burger, in view of Burger's 1981 projections, failed to comply with the strict language of paragraphs 1 and 2 of the Services Agreement where he agreed "to assist Krahmer in purchasing ... dairy cows of good quality" and "to provide the food and care to raise the Herd, to produce and sell its milk, and to improve its size and expand its quality"; and (2) that Burger mismanaged the herd and was responsible for the disease, poor breeding, and low milk production that plagued the dairy

project. The first argument is based on a strict interpretation of the terminology used in the contract whereas the latter contention follows from a broader construction of those contractual terms.

On the first point, the Investors propose that Burger's obligations under the Services Agreement be judged not under a best efforts or reasonable, prudent dairyman standard, but by a literal interpretation of the contractual language in the agreement. As stated previously, the Services Agreement is not a totally integrated contract because certain terms such as "assist", "raise", "expand", "improve", and "quality" are general, nontechnical terms with no specificity as to the degree of each term within the context of the contemplated services. Consequently, the parol evidence rule is not applicable here in view of the patent ambiguity of these terms, and extrinsic evidence is admissible to clarify their meaning. *Scott–Douglas Corp. v. Greyhound Corp., supra,* at 315. The Investors claim that these terms should be construed very strictly, but this cramped construction is buttressed solely by the optimistic projections that Burger provided Krahmer. As Krahmer testified at trial, the projections were just that, projections, rather than promises or guaranties, and Krahmer was aware of this at the time he made the services contract. Moreover, Krahmer should have been aware that Burger's projections were based on 120 mature milking cows rather than the large number of heifers which were not yet in production and which were obtained solely because of the Investors' tax considerations. Further, Krahmer, who is an attorney and draftsman of the agreement, should have any potential ambiguities in the language of the contract resolved against him. Restatement (Second) of Contracts § 206 (1979). This interpretation is buttressed by Krahmer's own testimony where he stated the "rule of reason" would limit Burger's flexibility under the contract, e.g., to declare most of the cows as cull cows and thus liquidate most of the herd under the agreement. Similarly, reasonableness must govern Burger's standard of care in the absence of any express

provision to the contrary. As a result, the Investors' restrictive reading of the contract must be rejected in favor of a fair, reasonable, and practical construction advocated by Burger and the plain language of the Services Agreement. *See* Restatement (Second) of Contracts § 203 (1979).

Additional grounds support this construction. Krahmer failed to regularly exercise his privilege under the consultation clause in the Services Agreement to object to Burger's handling of the Investors' herd or to clarify his view of what Burger's duties were under the contract. ("Burger and Krahmer agree to meet on a regular basis to discuss operations ... matters of importance relating to operation of the Herd.") The Investors also had the option in the 1983 lease amendment to back out of the deal if the dairy operation continued to lose money for six months straight, but they continued to proceed with the venture. "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in interpreting the agreement." Restatement (Second) of Contracts § 202(4) (1979). This acquiescence on the part of the Investors further supports a fair and reasonable construction of the terms in the services contract.

As to the standard of care required under the Services Agreement, the contract assigns to Burger the day-to-day management decisions regarding the herd. Consequently, he must be viewed as an independent contractor whose level of conduct had to be that of a "reasonably prudent dairyman" for this and similar localities. *See* Restatement (Second) of Torts § 299A (1979) (one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities). As a general rule in contract actions, "an independent contractor ... has a duty to perform his work in a diligent and reasonably skillful manner

..." 9 *Williston on Contracts* § 1012C (1961). If not described in the agreement, the standard of diligence is derived by the trier of fact from a consideration of what is reasonable given the nature of the employment. *Id.* Typically, one who holds himself out as exercising a profession or occupation thereby represents that he is .competent to perform the services incident to that profession or occupation and is bound to exercise the skill which is reasonable in light of that representation. *Id. See also Carroll v. Cohen,* Super., 28 Del. 233, 91 A. 1001, 1003 (1914). The Services Agreement does specify various duties of Burger such as "to assist Krahmer in purchasing", "to provide food and care to raise the herd", and "to expand its size and improve its quality", but this language must be viewed within a reasonableness framework which considers the uncertainties inherent in the dairy farming business.

█ Burger testified on his own behalf concerning the vicissitudes of the dairy business and the chronology of his management of the Investors' herd. He described the various problems that arose and his efforts to solve them. In addition, Burger introduced the expert testimony of Dr. George Haenlein who holds a Ph.D. degree in dairy science from the University of Wisconsin and is currently a professor of animal science at the University of Delaware. Dr. Haenlein is also the coordinator of the Dairy Herd Improvement Association (DHIA) who deals with half of Delaware's dairy farmers and compiles statistics on members' herds. According to Haenlein, who has known Burger for many years and has visited the Level End Farm on various occasions, Burger was an innovative dairyman who was continually attempting to improve his herd. Dr. Haenlein pointed out that increased milk production and herd growth are not exactly complementary curves but are, to a certain extent, inconsistent with one another. Dr. Haenlein's expert testimony authoritatively established that Burger fulfilled his duty to care for and feed the herd as well as to increase its size and improve its quality.

The Investors presented an array of statistics showing that the Level End dairy operation fell short of the 1981 projections as well as the performance of similar dairies in the region. The statistics' relation to the original projections has already been discounted as irrelevant to the contract, but the dairy's performance must be considered. The Investors' introduced expert testimony by John Hall who holds B.S. and M.S. degrees in dairy science and is employed by the University of Maryland. Hall testified solely upon his inspection of Burger's DHIA statistics on the Investors' herd and did not have an opportunity to physically inspect Burger's dairy farm. And, Hall's testimony was repeatedly qualified by the statement that "every situation is different" and, thus, the clear implication is that a more complex analysis was needed to control the various factors which may affect a given outcome. Some statistics were positive: the numbers show a high butterfat content throughout the life of the venture which brings an additional premium on the milk proceeds. But even though most of the other statistics are flat or modest, they cannot in themselves serve as a basis for finding a breach without concrete baseline statistics to measure them against. Hall testified generally in this regard but did not authoritatively state what the standard of care was. Additionally, Donald Breiner, field and quality control manager of the Atlantic Dairy Cooperative, testified to bacterial counts in the milk, but none of this testimony was linked directly with the actual care of the cows.

The Investors argue that Burger did not take proper care of the herd, particularly in view of the various diseases that developed in the herd. Dr. Forney testified that the cows' illnesses covered the entire spectrum of dairy diseases and that he or his associates visited the Level End Farm on many occasions. However, a closer examination of the diseases and the causes thereof reveal that Burger was not at fault and, indeed, did the best he could under the circumstances. The major outbreaks of cattle disease occurred in 1981 and 1983 when the herd was assembled or when additional cows were introduced. Burger

contacted veterinarian assistance during both outbreaks as soon as disease became evident throughout the herd. The evidence indicates that the Rudnicks were responsible for bringing the sick animals into the herd on both occasions. Although not conclusive, Krahmer's settlement with the Rudnicks suggests that Burger was not directly responsible for the pasteurella outbreak and he did not breach his duty to care for the animals under the circumstances.

The Investors also suggest that Burger's failure to employ artificial insemination (AI) in breeding the herd was a breach of Burger's promise to improve the herd quality. It is important to note first that the Services Agreement clearly puts "insemination" within the domain of management decisions under Burger's control. The Investors provide no extrinsic evidence showing the extent which Krahmer expected Burger to employ AI for breeding the herd, but simply tried to show that Burger ignored or cutback on AI as a means of improving the genetic quality of the herd. Hall testified that AI was the "way to go" for improving the genetic makeup of a dairy herd. Yet, the record indicates Burger made some effort to use AI on the herd. The veterinarian, Dr. Forney, testified that he and Burger discussed various breeding possibilities during the calving problems in the early 1980s. Burger testified that he called AI technicians numerous times, used a Kalmar heat detector and a bull to identify when cows were in heat, but was still not successful in timing the AI procedure. In this regard, Dr. Haenlein characterized AI as a "two edged sword" because though genetic benefits were derived through AI, detecting when cows were in heat was the major problem with AI. Although farm labor can roughly predict when a cow is in heat, Dr. Haenlein testified that the only sure way to ascertain this is with a bull and that it was common practice to keep a bull for this purpose as well as an alternative to AI. With respect to cost, Dr. Haenlein stated that AI is costly and that most dairy farmers who are low in cash will cut back on AI due to the high cash outlay. As a result, Burger's initial efforts to conduct AI must be tempered against the extreme cash shortfall as well as difficulties inherent in the AI process itself.

Finally, the mid–1980s drought's impact on the regional dairy business was pointed out by both Dr. Haenlein and Hall, and this unquestionably hurt the Investors' herd at the Level End Farm. Many farmers were forced to leave the business and the Atlantic Dairy Cooperative alone lost 500 members between 1987–1990. In Delaware, there was a declaration of emergency which brought relief contributions from other states to assist farmers in feeding their herds. Dr. Haenlein testified that both herd reproduction and milk reproduction are negatively affected by drought, and Burger testified that the drought had a definite effect on the cattle feed and milk prices. Although Burger did not plead impossibility or impracticability as an excuse for performance of the contract, such catastrophes are a risk of the dairy farming business and inherent to the dairy services that Burger provided.

Overall, though the Investors received no profits and suffered some financial loss, they still received certain tax benefits which the Federal Government allows to dairy investors. Nevertheless, disease, drought, regulatory changes in milk prices, and bad luck rather than Burger's lack of care and diligence all contributed to the financial demise of this venture. In hindsight, Burger's actions may not have been perfect or errorless, but he acted reasonably under the series of problems and hardships that plagued the herd. Burger also suffered from the same risks as did the Investors and had to file bankruptcy shortly after the auction of the herd. Accordingly, the Investors' claim based on Burger's breach of contract must be disallowed.

### Krahmer's Firm Had a Conflict of Interest with Burger

Alternatively, even if there had been some breach by Burger, the contract would be voidable by Burger because there was a conflict of interest between Burger and Krahmer's law firm, Morris, Nichols, Arsht & Tunnell. The court has found no

breach by Burger under the services contract so it need not explore this line of argument extensively because any repudiation by Burger would also cancel the approximate $20,000.00 feed debt he claims is owed him. A voidable agreement must cut both ways, and Burger cannot reap the benefits of the contract while attempting to avoid that same agreement, especially when he was not diligent with his disaffirmance of the contract. *See Glenn v. Tide Water Associated Oil Co.*, 34 Del.Ch. 198, 101 A.2d 339, 342 (1953). Still, this subject was raised by Burger and has some bearing on the construction of the contractual terms discussed previously and reinforces a construction that is more favorable to Burger than the Investors. Overall, the total evidence, both testamentary and documentary, indicate that Krahmer or Krahmer's firm had some kind of implied attorney-client relationship with Burger based on the circumstances surrounding their relationship.

■ Burger clearly had an attorney-client relationship with Biondi for roughly two years prior to his entering into the Services Agreement. Thus, this relationship must be imputed to Krahmer since both were partners at Morris, Nichols, Arsht & Tunnel at the time the contract was executed. Burger testified that Biondi was pretty much aware of what was going on at Burger's farm, and there was no evidence of "cone of silence" procedures to insulate Biondi's knowledge from Krahmer. *See Nemours Foundation v. Gilbane, Aetna, Federal Ins. Co.*, 632 F.Supp. 418 (D.Del.1986). *See also* Rule of Prof. Conduct 1.10; DR 5–104(A). Moreover, various attorneys of Morris, Nichols, Arsht & Tunnell, including Krahmer, assisted Burger on a variety of matters although all of these related in some way to the Investors' financial stake in Burger's operations. Krahmer wrote a letter only 16 days after the services contract was made regarding the Clean Water Program Contract on Burger's farm, and he assisted Burger on refinancing arrangements involving First National Bank of Wilmington. In August of 1983, Reid, then an associate at Morris, Nichols, Arsht & Tunnell, wrote a letter to the seller, financier, and manufacturer of Burger's Slurrystore System concerning problems that Burger was having with that system. At trial, Burger testified that he thought Krahmer was his lawyer for a time after signing the services contract, but Krahmer strenuously rebutted this and testified that he told Burger on numerous occasions to obtain separate counsel. Indeed, Burger acknowledges in a letter about refinancing written over two months after making the services contract that the Investors were "represented by Mr. Krahmer." As a result, it appears to be uncertain whether Burger reasonably believed Krahmer to be representing him after this point or that he passively accepted Krahmer's legal services as a "bonus" from the services contract.

Still, the most tangible evidence that an attorney-client relationship existed between Burger and Krahmer (and/or Krahmer's law firm) comes from three bills for "professional services" rendered which are all addressed to Mr. Josef A. Burger. Krahmer billed Burger on three occasions: on December 20, 1982, March 24, 1984, and November 8, 1985 for legal services rendered in connection with Burger's dairy farm. Clearly, Krahmer's letter of December 20, 1982, which accompanied that particular bill underscores the fact that legal services were benefitting both Burger and the Investors and, thus, the suggestion that a 50–50 breakdown of the legal services between Burger and the Investors reveals that there was some sort of conflict of interest. This is true not only because Krahmer was an attorney representing the investors, but also because he was one of the Investors with a one-sixth interest therein. Furthermore, Krahmer's letter dated November 8, 1985, accompanying that bill demands payment toward the $14,573.40 billed by Krahmer's firm "for services for the dairy and for [Burger] personally" which had not been paid by Burger. Although there is no retainer or documentation formalizing an attorney-client relationship, these documents indicate that Krahmer or members of Krahmer's firm ostensibly represented Burger.

At the time of signing the 1981 Services Agreement, the Disciplinary Rules of Professional Responsibility were in force governing attorneys' conduct until the revised Professional Code of Conduct supplanted these in 1985. The rules serve as guideposts for measuring an attorney's conduct given his role in the justice system and society in general. DR 5–104(A) states that "a lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after disclosure." The Delaware Rules of Professional Conduct, effective October 1, 1985, also have several express provisions prohibiting conflicts of interest. *See* Del.Rules of Prof.Conduct 1.7, 1.8, 1.9, 1.10. Based on the evidence, Krahmer came close to violating the spirit if not the actual letter of these conflicts of interest rules. Of course, a written waiver by Burger might have dispelled any notion about a conflict of interest existing between the principals and Krahmer. *See* Del.Rule of Prof.Conduct 2.2.

■ Delaware case law has established that any business transaction between an attorney and client is presumptively invalid unless there is clear and convincing evidence showing full and complete disclosure of all facts known to the attorney and absolute independence of action on the part of the client. *Melson v. Michlin,* Supr., 43 Del.Ch. 239, 223 A.2d 338, 344 (1966). More to the point on this particular situation, the *Melson* case states that a conflict of interest which was reasonably foreseeable by the attorney is also voidable as though adverse from the outset. *Id.* Even though the court might have applied *Melson* here, it declines to do so for a number of reasons. First, as stated previously, the court views this avenue of argument by Burger as an alternate means of relief which would erase the entire dairy transaction and preclude him from recovering feed monies. Second, *Melson* involved an attorney who was the principal in the tainted transaction whereas here Krahmer is simply one of the Investors. Third, *Melson*

concerned an express attorney-client relationship whereas in this case Krahmer's relationship with Burger is largely imputed or otherwise connected with Krahmer's billings. Finally, the *Melson* progeny is actually quite limited with no contracts being voided based on the principles of that case. Therefore, though there are indicia of a conflict of interest which tainted this transaction, the court chooses not to take action on this subject.

### *Burger Entitled to Feed Monies From the Investors*

■ Burger claims that the Investors still owe him approximately $20,000.00 in feed expended by him for the herd. Krahmer admitted in his testimony that Burger was owed feed monies which were past due and his bookkeeping records reveal that $21,264.64 was due Burger at the end of 1988. Likewise, Burger testified that he was owed roughly this amount and a contingent claim for this sum was listed on his bankruptcy schedules. Under the Services Agreement, there is no doubt that Krahmer bears "[d]irect expenses of the operation of the Herd" and there are other provisions which set out precisely how the cost of the feed would be determined. As a result, there is no real dispute that the Investors still owe Burger $21,264.64 for the feed he provided to the Investors' herd.

### *Rule 11 Sanctions, Attorney's Fees and Prejudgment Interest*

■ Burger contends that this court should impose sanctions under Bankruptcy Rule 9011(a), which generally tracks Fed.R. Civ.P 11, since the Investors' claim was frivolous. Rule 9011 should be very narrowly construed and applied only where the offending attorney's work product is patently frivolous or counsel's motivations blatantly improper. *See In re Geller,* 96 B.R. 564 (Bankr.E.D.Pa.1989). In this case, though the Investors' claim cannot prevail based on the record presented, there was still a colorable claim against Burger even though the services contract was substantially performed. Despite seven years of abiding under the services contract, the

Investors may still contend that substantial performance was not full performance and, consequently, may still claim damages therefrom. *See, e.g., Cox v. Fremont County Public Bldg. Authority,* 415 F.2d 882 (10th Cir.1969). Accordingly, Burger's request that Rule 11 sanctions be imposed must be denied.

 Similarly, Burger's demand for attorney's fees based on equitable principles must also fail. Where a party hinders the orderly administration of a bankruptcy estate, equity may require an award of attorney's fees to offset the offending party's bad faith. *See In re Deemer Steel Casting Co., Inc.,* 117 B.R. 103, 108–09 (Bankr.D.Del.1990). When such exceptional circumstances do not exist, the American rule governs and, thus, attorney's fees and litigation costs are not usually recoverable absent a statute or enforceable contractual provision providing for them. *See* 22 Am. Jur.2d *Damages* § 611 (1988). In the instant matter, the Investors made a *prima facie* case against Burger which required Burger to produce refuting evidence in order to prevail on the merits. Consequently, attorney's fees cannot be awarded to Burger.

 Yet, as to Burger's claim for prejudgment interest, it appears that there is justification for such an award. In general, prejudgment interest is available in this state as a matter of right. *Moskowitz v. Mayor & Council of Wilmington,* Del. Supr., 391 A.2d 209 (1978). The standard typically applied by the Delaware courts is to award prejudgment interest in cases where testimony shows that the amount of recovery can be calculated and ascertained. *Rollins Environmental Serv., Inc. v. WSMW Indus.,* Del.Super., 426 A.2d 1363, 1366 (1980). *See also* Restatement (Second) of Torts § 913 (1965). Here, there is no question that the amount Burger seeks to recover from the Investors is a fixed, liquidated amount calculable which was owed but never paid under the services contract.

For the foregoing reasons, judgment will be entered in favor of Josef A. Burger and Vera L. Burger and against Level End

Dairy Investors. An order in accordance with this Memorandum Opinion is attached.

### ORDER

AND NOW, April 3, 1991, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT:

1. Judgment is entered in favor of Plaintiffs for $21,264.64 against Defendant, plus prejudgment interest from September 1, 1988.

2. Defendant's proof of claim filed August 16, 1989, is disallowed. However, Defendant is granted leave to file on or before April 22, 1991, an amended proof of claim in the amount of $7,000.00, plus prejudgment interest from May 22, 1989 to June 28, 1989.